Dale M. Cendali (admitted *pro hac vice*)
dale.cendali@kirkland.com
Joshua L. Simmons (admitted *pro hac vice*)
joshua.simmons@kirkland.com
Katharine H. Cummings (admitted *pro hac vice*)
katharine.cummings@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel. (212) 446-4800
Fax (212) 446-4900

Yimeng Dou (SBN 285248)
yimeng.dou@kirkland.com
N. Yvonne Stoddard (SBN 325321)
yvonne.stoddard@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Tel. (213) 680-8400
Fax (213) 680-8500

Miranda Means (admitted *pro hac vice*)
miranda.means@kirkland.com
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Tel. (617) 385-7500
Fax (617) 385-7501

*Attorneys for Defendant/Counterclaimant*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION - LOS ANGELES

| | |
|---|---|
| TERADYNE, INC., | ) CASE NO. 2:20-cv-02713 GW (SHK) |
| Plaintiff/ Counterdefendant, | ) **ASTRONICS TEST SYSTEMS, INC.'S RESPONSE TO TERADYNE'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | ) |
| ASTRONICS TEST SYSTEMS, INC. | ) HON. GEORGE WU |
| Defendant/ Counterclaimant. | ) |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................ 1

II.  OVERVIEW OF THE '479 PATENT ................................................. 2

III. RELEVANT LEGAL STANDARDS ................................................. 3

IV.  CONSTRUCTION OF THE DISPUTED TERMS ............................ 3

   A. "comparison output having a value" ................................................ 3

   B. "control circuitry" ........................................................................... 7

   C. "measured value input(s)" ............................................................ 10

      1. The term "measured value input(s)" is indefinite ..................... 11

      2. If the term is not indefinite, the Court should adopt ATS's alternative construction. .......................................................................... 16

   D. "threshold outputs" ...................................................................... 17

      1. The term "threshold outputs" is indefinite. .............................. 18

      2. If the term is not indefinite, the Court should adopt ATS's alternative construction. .......................................................................... 20

   E. "low pass filter and/or delay element coupled between the over-voltage output and the comparison outputs of the two of the at least comparison sub-circuits"... 22

      1. This term is indefinite. ............................................................. 22

      2. If the term is not indefinite, the Court should adopt ATS's alternative construction. .......................................................................... 24

V.   CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Kerr Corp.*,
   No. 07 Civ. 087, 2007 WL 5650184 (W.D. Wis. Mar. 28, 2007).......................4

*ADE Corp. v. KLA-Tencor Corp.*,
   252 F. Supp. 2d 40 (D. Del. 2003)....................................................................4

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) ......................................................................13

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) ..........................................................................2

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ......................................................................15

*Finjan, Inc. v. ESET, LLC*,
   No. 17 Civ. 183, 2021 WL 1241143 (S.D. Cal. Mar. 29, 2021) ....................3, 4

*Guinn v. Kopf*,
   96 F.3d 1419 (Fed. Cir. 1996) ..........................................................................1

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) .................................................13, 14, 16, 21

*Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc.*,
   839 F. App'x 500 (Fed. Cir. 2021) ................................................................17

*IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*,
   No. 18 Civ. 0555, 2019 WL 3936656 (D. Del. Aug. 20, 2019) ......................18

*Infinity Comput. Prods., Inc. v. Oki Data Ams. Inc.*,
   987 F.3d 1053 (Fed. Cir. 2021) ......................................................................23

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ........................................................................9

*Mallinckrodt, Inc. v. Masimo Corp.*,
   254 F. Supp. 2d 1140 (C.D. Cal. 2003) ...........................................................4

ii

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ...............................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)..............................................................3, 12, 22

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  977 F. Supp. 2d 1013 (S.D. Cal. 2013) ...............................................4

*Paragon Sols., LLC v. Timex Corp.*,
  566 F.3d 1075 (Fed. Cir. 2009) ...................................................8, 23

*Pause Tech., LLC v. TiVo, Inc.*,
  419 F.3d 1326 (Fed. Cir. 2005) ..........................................................8

*PODS, Inc. v. Porta Stor, Inc.*,
  484 F.3d 1359 (Fed. Cir. 2007) ........................................................23

*SA Recycling LLC v. Kramar's Iron & Metal, Inc.*,
  No. 12 Civ. 416, 2014 WL 12558791 (C.D. Cal. May 5, 2014) ........16

*Sensor Elec. Tech., Inc. v. Bolb, Inc.*,
  No. 18 Civ. 5194, 2019 WL 4645338 (N.D. Cal. Sept. 24, 2019) .........12, 14, 18

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
  No. 06 Civ. 0611, 2007 WL 5614101 (W.D. Wis. Aug. 20, 2007).................5, 6

*SIPCO, LLC v. Emerson Elec. Co.*,
  794 F. App'x 946 (Fed. Cir. 2019) ....................................................16

*Starhome GmbH v. AT & T Mobility LLC*,
  743 F.3d 849 (Fed. Cir. 2014) ..........................................................16

*TNS Media Rsch., LLC v. TRA Glob., Inc.*,
  No. 11 Civ. 4039, 2012 WL 3756325 (S.D.N.Y. Aug. 29, 2012).......................8

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ...........................................................2

*TQ Delta, LLC v. 2Wire, Inc.*,
  No. 13 Civ. 2013, 2018 WL 3238776 (D. Del. July 3, 2018) .............................4

*TVnGO Ltd. v. LG Elecs., Inc.*,
  No. 18 Civ. 10238, 2020 WL 1899781 (D.N.J. Apr. 17, 2020).......10, 12, 14, 18

iii

# I.  INTRODUCTION

Teradyne has a problem.  U.S. Patent No. 7,395,479 (the "'479 Patent") uses confusing, undefined claim terms that have no meaning to a person having ordinary skill in the art ("POSA").  The purported invention is simple—as Teradyne's expert, Dr. Horenstein, admitted during his deposition, the technology is similar to a "simple fuse in the basement of a house."  Declaration of Yimeng Dou, dated May 27, 2021[1], Ex. 1 (Horenstein Dep. Tr.) at 26:5–8.  The claims are directed to test equipment that compares the voltage from a unit under test ("UUT") with threshold values and then indicates the results (*e.g.*, above or below the thresholds) of such comparisons.  As used in the '479 Patent, however, the claim terms are ambiguous and in many cases, indefinite.

Teradyne tacitly conceded that the '479 Patent's claim terms are problematic.  In the parties' Joint Claim Construction and Prehearing Statement, ATS identified the indefinite nature of several of the patent's claim terms.  Dkt. 80.  In response, Teradyne dropped independent claim 9 and its dependent claims 10–13 from this litigation in an attempt to avoid a court ruling, Dkt. 83 at 2, even going so far as relinquishing all of its rights in those claims.[2]

The remaining claims—independent claim 1 and dependent claims 2–8—also suffer from fatal claim construction issues.  Three of the claim terms at issue make no sense as used in the patent.  The remaining terms have specific meanings when reviewed in light of patent's specification.  And Teradyne's constructions of those terms directly conflict with its previously proposed constructions for the dropped claims.

Hoping to paper over these failings, Teradyne asks this Court not to construe the patent's terms, instead resting on alleged plain and ordinary meanings that would lead to an overly broad and unclear patent scope.  Yet, Teradyne's explanation of that meaning ignores how the disputed terms are used (or not used) in the patent's specification, what

---

[1]  All exhibits cited herein are exhibits to the Declaration of Yimeng Dou, filed concurrently.

[2]  Ex. 2 (Teradyne's Disclaimer); *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996).

the underlying technology is, and accepted meanings for the disputed terms in the art. ATS, by contrast, has proposed specific constructions based on the terms' use in the patent's claim in light of the specification and the art.  When viewed with the claim language, specification, and extrinsic evidence, Teradyne's proposed constructions are incorrect and should be rejected.[3]

## II.    OVERVIEW OF THE '479 PATENT

The '479 Patent relates to ATEs that are used to test and verify the performance of electronic devices, the UUTs.  '479 Patent at 1:11–38.  For example, ATEs can be used to test whether UUTs are operating above or below intended voltage levels, meaning testing whether they use voltage levels that are too high or too low.  *Id*.  The '479 Patent admits that prior ATEs included such testing capability and also included over-voltage protection to protect from damage caused "when the voltage . . . exceeds a specific value," *i.e.*, damage caused by voltages that are outside of the designed range.  *Id*. at 1:11–53 (conventional testing); 1:54–61 (over-voltage protection).[4]  As Teradyne's own expert Dr. Horenstein admitted, over-voltage protection is like a "simple fuse in the basement of a house"; it operates to prevent damage when voltage gets too high.  Ex. 1 at 26:5–8; *see also* '479 Patent at 1:54–61 (describing the use of "[t]raditional and solid state fuses" and/or "switches . . . used along with a voltage sensing circuit").

As Dr. Wicker explained, none of the claim terms in dispute have plain or ordinary

---

[3]    On April 21, 2021, Teradyne filed a notice with the Patent Office that disclaimed claims 9–13.  (Ex. 2).  In light of Teradyne's disclaimer and current remaining contentions, and in the interest of streamlining the parties' disputes for this particular case and patent claim, ATS will agree to Teradyne's proposal that the preamble of claim 1 of the '479 patent is limiting.  ATS, however, maintains that the case law is clear that a preamble is not automatically deemed limiting simply because it creates antecedent basis.  *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("dependence on a particular disputed preamble phrase for antecedent basis ***may*** limit claim scope," but does not necessarily do so); *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322–24 (Fed. Cir. 2015) (similar).

[4]    Teradyne's expert, Dr. Horenstein, did not opine on prior art to the '479 Patent other than identifying what the specification discloses was "conventional."  *See* Dkt. 87-3, ¶¶ 32–33; Ex. 1 at 95:4–96:15, 99:14–18.  Unlike Dr. Wicker, Dr. Horenstein did not make an independent evaluation of whether the patent's assertions were correct.

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

meanings as they are not known, technical terms.  Wicker Decl. ¶¶ 51, 79, 109.  Even the inventor of the '479 Patent admitted that the terms at issue were not used and understood by a POSA.  Ex. 6 at 223:22–224:5, 225:5–9, 225:17–20.

## III.   RELEVANT LEGAL STANDARDS

Construing the claims in a patent is a question of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–78 (Fed. Cir. 1995).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  In other words, "[a] defined term is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."  *Finjan, Inc. v. ESET, LLC*, No. 17 Civ. 183, 2021 WL 1241143, at *3 (S.D. Cal. Mar. 29, 2021) (citation omitted).

## IV.   CONSTRUCTION OF THE DISPUTED TERMS

### A.   "comparison output having a value"

| Claim Term | ATS's Proposed Construction | Teradyne's Proposed Construction |
|---|---|---|
| "comparison output having a value" (claims 1 and 2) | comparison output having an alphanumeric value | Plain and ordinary meaning. |

The parties' dispute with respect to the term "comparison output having a value" comes down to whether that value is alphanumeric.  It is for several reasons.  ***First***, claim 1 recites: "a comparison output signal at the comparison output having a value ***indicating the value*** of the input signal ***relative to*** the value of the threshold input signal."  *See* '479 Patent at cl. 1.  Thus, the claim language requires that the "comparison output having a value" indicates the value of the input signal ***relative to*** the value of the threshold input signal.  For a value to be ***relative***, it must be something that can be compared and, thus, must be alphanumeric.

***Second***, the '479 Patent's specification itself indicates that the "output of

3

comparator 209 is asserted" when "the value on line 215 *is less than* the value specified by low threshold control input 231." '479 Patent at 6:30–32. In other words, the "value" must be capable of being compared and, where appropriate, determined to be "less than" another value. Only an alphanumeric value would be capable of being compared in this way. Moreover, the specification requires that "values" output by comparators 203 and 205 be capable of indicating whether an over-voltage condition has occurred because the value "falls below" or "exceeds" the threshold voltage. *See* '479 Patent at 7:7–18; s*ee also id*. at 7:33–38 ("Digital control circuit 201 includes logic that sets the value on safe/alarm output 217 *based on the values output by comparators 203 and 205*."). To do this, the value would necessarily be represented by numbers, letters, or a combination of the two. Wicker Decl. ¶ 60. Further, the specification requires that the "values" output by "[c]omparators 207 and 209 indicate whether the level of the signal on line 215 is *above or below* certain threshold levels that characterize normal operating conditions." '479 Patent at 6:64–66. Thus, ATS's proposed construction "comparison output having an alphanumeric value" is sufficient to capture the meaning of the term (*e.g.*, above or below, or binary 1 or 0), but also sufficiently narrow so that a POSA would understand the scope of the claim.

   ***Third***, courts regularly have construed the term "value" to mean a numeric value. *See, e.g., TQ Delta, LLC v. 2Wire, Inc.*, No. 13 Civ. 2013, 2018 WL 3238776, at *4 (D. Del. July 3, 2018) (construing "interleaver parameter value" to be numerical); *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 977 F. Supp. 2d 1013, 1019 (S.D. Cal. 2013), *aff'd*, 778 F.3d 1021 (Fed. Cir. 2015) (construing "tempo value" and "pace value" as numbers); *3M Co. v. Kerr Corp.*, No. 07 Civ. 087, 2007 WL 5650184, at *1 (W.D. Wis. Mar. 28, 2007) (holding that "visual opacity value" is numerical); *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 69 (D. Del. 2003) (holding that "value" represents "numerical quantities" and that "threshold value" means "a numerical quantity above which something is true or will take place and below which it is not or will not") (internal quotation marks omitted); *Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140,

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

1153 (C.D. Cal. 2003) (construing "value" to mean "a single numerical quantity").

*Fourth*, as Dr. Wicker explained, a POSA would have understood the term to mean "comparison output having an alphanumeric value." Wicker Decl. ¶ 57. A POSA reading these claims would have understood that the indication of the value of the input signal relative to the value of the threshold input signal—*e.g.*, *higher* or *lower*—would be represented in alphanumeric form, *e.g.*, as either letters or numbers. *Id.* ¶¶ 58–59.

*Fifth*, extrinsic evidence supports ATS's proposed construction. Dictionary definitions of the term "value" require it to be quantitative in nature, consistent with ATS's proposal of "alphanumeric value." *See* Ex. 7 (*IEEE 100 The Authoritative Dictionary of IEEE Standard Terms* (7th ed. 2000)) at 1244 (defining "value" as "[t]he quantitative measure of a signal or variable"); Ex. 8 (*McGraw-Hill Dictionary of Scientific and Technical Terms* (6th ed. 2003)) at 2240 (defining "value" as "[t]he magnitude of a quantity"); Ex. 9 (*Webster's II New College Dictionary* (1995)) at 1219 (defining "value" as "[a]n amount regarded as a suitable equivalent for something else").

Hoping to broaden the construction beyond the '479 Patent's teachings, Teradyne argues for a construction of this term based on its supposed plain and ordinary meaning. Yet, the inventor of the '479 Patent, Mr. Gohel, admitted that the term does not have a plain and ordinary meaning. Ex. 6 at 223:22–224:5. Indeed, he testified that the term is not technical language that he would use. *Id.* Teradyne's arguments in support of its construction deviate from the intrinsic and extrinsic record:

- First, Teradyne claims that it intended its plain and ordinary meaning construction to be broader and include "one of two voltage states," Teradyne Br. 11, but that is not supported by either the claim language or the specification. '479 Patent at 6:30–32 (using "value" as something that is "less than"); *see Silicon Graphics, Inc. v. ATI Techs., Inc.*, No. 06 Civ 0611, 2007 WL 5614101, at *14 (W.D. Wis. Aug. 20, 2007) (holding that "values" must be "numeric" because "it would be odd to compare a report of non-numeric values of any sort to a 'threshold'"). Further, Teradyne fails to explain why its proposed "one of two voltage states" cannot be represented by

alphanumeric values.  Wicker Decl. ¶¶ 58–60.

- Second, Teradyne asserts that the specification shows that "the comparator has an output signal (typically one of two voltage states, *e.g.*, high or low; or positive or negative) that indicates which of the two inputs to the comparator is greater than the other." Teradyne Br. 11.  Yet, to show this, Teradyne relied on the same portion of the specification addressed above, '479 Patent at 6:30–32, which requires the value at issue to be capable of being less than another value.  *See supra* 3.  Where an invention requires showing a difference between values, they should be construed to be numeric.  *See Silicon Graphics*, 2007 WL 5614101, at *14.  Positive or negative voltages are not indications of *relative* value, as required by the claim.

- Third, Teradyne argues that there are at least two types of "values" in the context of the claim: "(1) a value that indicates *whether* the input signal is higher or lower relative to the threshold signal and (2) a value that indicates *how much* higher or lower the input signal is relative to the threshold signal." Teradyne Br. 11 (emphasis in original).  Yet, it incorrectly asserts a value of positive or negative is an example of the first category when, as previously stated, these are not *relative* values as the claim requires.  '479 Patent at cls. 1–2 ("comparison output having a value *indicating the value* of the input signal *relative to the value* of the threshold input signal").  If the inventors had intended to adopt Teradyne's proposal, the claim would not require a value at all.

- Fourth, Teradyne argues that ATS's construction would exclude values that indicate whether the input signal is higher or lower relative to the threshold signal, which is a preferred embodiment.  Teradyne Br. 11–13.  That is wrong.  As Dr. Wicker explained, ATS's proposed construction captures the full scope of the term to a POSA, who would have "understood that to indicate the value of the input signal relative to the value of the threshold input signal, *e.g.*, *above* . . . or *below* . . . all of which can be represented either as characters or numbers." Wicker Decl. ¶¶ 57–59.  Whether the input signal is above or below relative to the value of the threshold input

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

signal can easily be represented in alphanumeric form, which the '479 Patent readily admits was widely done before. '479 Patent at 1:46–53 (prior art had "dual-threshold detection . . . **above** the **specified** high voltage **or below** the **specified** low voltage").

- Fifth, Teradyne argues that ATS's construction introduces ambiguity, but Teradyne only tells half the story. For example, Teradyne claims that Dr. Wicker testified that control circuitry rather than the output of the comparison sub-circuits measures the difference in values. Teradyne Br. 13. That is not true. Dr. Wicker explicitly stated, "the control circuitry . . . is, in turn, driven by the output of the comparators." Ex. 5 at 107:14–17. Likewise, contrary to Teradyne's assertion that Dr. Wicker testified that alphanumeric signal would not be understood by a POSA, Dr. Wicker actually stated that an alphanumeric signal is "one that would convey enough information for that signal to be converted into an indication." Ex. 5 at 110:21–23.

Thus, the Court should construe the term "comparison output having a value" to mean "comparison output having an alphanumeric value."

### B. "control circuitry"

| Claim Term | ATS's Proposed Construction | Teradyne's Proposed Construction |
|---|---|---|
| "control circuitry" (claims 1, 2, 4, 7, 8) | a field programmable gate array (FPGA) or a similar microprocessor | Plain and ordinary meaning. |

In the context of the '479 Patent, "control circuitry" means "a field programmable gate array (FPGA) or similar microprocessor." Not only does the patent make clear that the "control circuitry" must be of the type used in "[a]utomatic test equipment," '479 Patent, cl. 1, but it also specifically must be "suitable" for an ATE. *Id.* at 6:4–5; *see id.* at Abstract. As Dr. Wicker's unrebutted testimony makes clear such circuitry is "limited by available onboard space of the" ATE. Wicker Decl. ¶¶ 68–69. Thus, the question is really what would be suitable circuitry under those constrained limitations. The patent provides the answer: "digital controls 201 are implemented as *a field programmable gate array (FPGA)*," '479 Patent at 6:5–6, which is a type of integrated circuit, also known as

a "chip," that can fit into the ATE.  This makes sense as FPGAs and similar microprocessors were commonly used in ATEs around 2004.  Wicker Decl. ¶ 68.  By contrast, other chips or large circuitry would not fit in the channel circuits of ATEs known to POSAs around 2004.  *Id.* ¶ 69.  By referring to "any **suitable** circuit" and not just "***any circuit***," the specification is referring back to the FPGA and/or microprocessor discussed in the specification.

In addition to the intrinsic evidence, ATS's construction is supported by the extrinsic record.  As Dr. Wicker discussed, in a textbook that would be available to a POSA considering this term, there is a figure of an ATE that performs "voltage measurement," which is connected to a "***microprocessor***."  *See* Ex. 10 (Keith Brindley, *Automatic Test Equipment* (1991)) at FIG. 1.1.  This is additional support for ATS's construction, which includes "a similar microprocessor," and it corroborates Dr. Wicker's conclusion that a POSA would understand the control circuitry to be an FPGA or a similar microprocessor.  Wicker Decl. ¶ 69.  Further, that statement stands unrebutted as Teradyne's expert has no opinion on the term "control circuitry."  Thus, the Court should construe "control circuitry" to mean "a field programmable gate array (FPGA) or similar microprocessor."

Teradyne's arguments to the contrary are incorrect:

- In contrast with ATS's straightforward reading of the patent's requirements, Teradyne first argues that this term should be given a plain and ordinary meaning that would ignore the actual claim language, *i.e.*, that the control circuitry is used in an "[a]utomatic test equipment."  *See* '479 Patent, cl. 1.  That cannot be correct.  *See Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ("[P]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation.") (quotation omitted); *TNS Media Rsch., LLC v. TRA Glob., Inc.*, No. 11 Civ. 4039, 2012 WL 3756325, at *13 (S.D.N.Y. Aug. 29, 2012) (rejecting a proposed construction that "ignore[d] the context of the full claim"); *Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1088 (Fed. Cir. 2009) (rejecting a construction

8

1    that ignores claim language).

2    • Teradyne next asserts that ATS's construction should not be adopted because

3    purportedly, the patent lacks the use of its own lexicography or disavowal.  Teradyne

4    Br. 14.  Yet, claim construction should start with the claim language itself and be

5    "firmly anchored in reality by the understanding of those of ordinary skill in the art."

6    *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999).  As discussed,

7    the "control circuitry" is part of an ATE, and neither Teradyne nor its expert proffers

8    any actual evidence to rebut Dr. Wicker's opinion about the practical limits of ATEs

9    at the time of the alleged invention.

10   • Teradyne also argues that ATS "improperly limits the claims to a disclosed

11   embodiment" of the FPGA chip only.  Teradyne Br. 14–15.  But that is incorrect as, in

12   addition to the FPGA chip disclosed in the embodiment, ATS's proposal includes "a

13   similar microprocessor."

14   • Teradyne further asserts that ATS's proposal (including "or a similar

15   microprocessor") would "introduce ambiguity and be virtually impossible to apply."

16   Teradyne Br. 15.  But Teradyne fails to support its argument with any evidence that a

17   POSA would not understand what "a similar microprocessor" is.  *Id.*  Moreover, in

18   support of its argument, Teradyne misrepresents Dr. Wicker's testimony to suggest

19   that he states that "even having components such as a pull-down resistor outside of an

20   integrated circuit" would not be an FPGA or a similar microprocessor and still be

21   within the scope of ATS's construction.  *Id.*  But Teradyne omitted critical words

22   from Dr. Wicker's testimony, which actually indicated that "there are always pull-

23   down resistors and whatnot that one uses ***in conjunction*** with a given integrated

24   circuit."  Ex. 5 at 118:3-11.  Teradyne's argument thus defies logic as it offers nothing

25   to show why the control circuitry proposed by ATS cannot be used in conjunction

26   with additional parts.  Applying Teradyne's logic, any common electrical parts used to

27   fix the control circuitry to the ATE device or in conjunction with the circuitry would

28   "introduce ambiguity."  That cannot be correct.

9

1    •   Teradyne finally argues that there is no support for ATS's single component

2       limitation.  But nowhere does Teradyne address ATS's evidence that, due to ATEs'

3       practical constraints, specific control circuitry would be required.  Instead, Teradyne

4       claims that Dr. Wicker's statement that "two processors" would be acceptable within

5       the meaning of "control circuitry" contradicts his observations on size constraints.

6       Teradyne Br. 16.  Yet, Dr. Wicker confirmed that the circuitry that would implement

7       the functions would be the "disclosed FPGA" and "'what's disclosed' is a ***single***

8       FPGA."  Ex. 5, 117:8–118:2.  When he explained that there is no "general

9       requirement for just one circuit that ***does everything***," he was discussing "circuitry

10      that would be able to implement" the functions of the control circuitry, and not how

11      many or what specific chips would fit into the ATE.  *Id*.

12   Accordingly, ATS respectfully requests that the Court adopt its proposed construction.

13      **C.**     **"measured value input(s)"**

| Claim Term | ATS's Proposed Construction | Teradyne's Proposed Construction |
|---|---|---|
| "measured value input(s)"<br><br>(claims 1, 2) | Indefinite<br><br>If not indefinite:<br>"voltage data input component(s)" | Plain and ordinary meaning. |

19       The parties dispute whether this term is indefinite and if not, what its construction

20   should be.  It is indefinite for two reasons: (1) a POSA reading the '479 Patent would be

21   confused as to whether the term refers to an electrical signal or a physical component,

22   and (2) assuming it is a physical component, a POSA would be confused as to whether

23   the term refers to an input for receiving a "measured value" or an input for receiving a

24   "comparison output signal."  *See TVnGO Ltd. v. LG Elecs., Inc.*, No. 18 Civ. 10238, 2020

25   WL 1899781, at *3 (D.N.J. Apr. 17, 2020) (finding a term indefinite because the "patents

26   provide no guidance as to how a POSA could confidently choose between the two

27   possibilities" of what the term means).

28

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF         CASE NO.: 2:20-CV-02713 GW (SHK)

### 1. The term "measured value input(s)" is indefinite

*First*, the term is indefinite because a POSA would not understand whether the term refers to an electrical signal or a physical component. As an initial matter, the term "measured value input(s)" is not defined, discussed, or explained anywhere in the claims or specification. It merely appears in claim 1. Thus, a POSA is left to guess at its meaning using only the words of the claim, which are ambiguous.

Claim 1 recites "control circuitry having at least two measured value inputs." Read in context, the term "measured value inputs" can have one of two meanings—either it indicates that a "measured value" is *put into* the control circuitry or it indicates a *physical component through which* a "measured value" is put into the control circuitry. Thus, the term as used in claims 1–2 is confusing and is open to differing interpretations by a POSA. Indeed, both parties' experts agreed that "measured value input(s)" could be either an electrical signal or a physical component. Teradyne's expert Dr. Horenstein testified that inputs "could be" either physical parts of or signals in ATE. Ex. 1 at 53:17–22; *see also* Ex. 5 at 119:8–15. Dr. Wicker agreed. Wicker Decl. ¶¶ 75–76. Given the experts' agreement on the differing meanings of the term, the term is indefinite.

Looking to the specification provides no clarity because the term "measured value input(s)" is never discussed nor is it depicted in any of the '479 Patent's figures. Adding to the confusion, the specification uses the term "input" interchangeably to mean an electrical signal and/or a physical component. *Compare, e.g.*, '479 Patent at 5:5–7 ("where a relatively **high powered input is** incorrectly **provided to** a low voltage digital device, damage . . . may occur"), 6:23–26 ("comparators . . . may **receive as an input the signal** on line 215"), 6:27; 6:33; 7:11–12; 10:39–41; 10:65–66, 11:3–5 ("The output of comparator 209 is **applied as an input to** [control circuitry]."), 11:16–17 ("The second **input to** [control circuitry] **is a** TW control **signal**.") (inputs as electrical signals), *with e.g.*, '479 Patent at 1:54–57 ("voltage and/or current applied **at the input**"); 2:32–33 ("a **threshold input adapted to receive** at least one threshold input signal"); 8:65–67 (inputs as physical components). Thus, the specification also supports two different readings of

11

the term: the "measured value inputs" are either signals that provide "measured values" to the control circuitry or they are physical components on the control circuitry that receive "measured values."

Because the words of the claims, the specification, and the knowledge of a POSA all support differing interpretations, the term is indefinite. *Nautilus*, 572 U.S. at 901; *TVnGO*, 2020 WL 1899781, at *3; *Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18 Civ. 5194, 2019 WL 4645338, at *34 (N.D. Cal. Sept. 24, 2019) ("a claim is indefinite if the specification lacks adequate guidance to give the claim term a reasonably clear and exclusive definition.") (internal quotation marks omitted).

***Second***, even assuming the term refers to either a physical component or a connection point, node, or terminal, a POSA reading the '479 Patent would be confused as to whether the term refers to either an input for receiving a "measured value" or an input for receiving a "comparison output signal" per the words of the claims. '479 Patent, cls. 1–2. Here, the confusion lies in the "measured value" portion of the term (*i.e.*, neither the claims nor the specification definitively explain what a "measured value" is). The problem with the claims is that they refer to the same signal—the signal coming out of the comparison sub-circuit—as both the "measured value" and "comparison output signal." *Id*. Teradyne admits that a POSA would understand "measured value input" to be an input that receives a "measured value." Teradyne Br. 17 ("[T]he claim provides sufficient guidance to a POSITA that the 'measured value input' of the control circuitry is a ***measured value*** input because it receives a signal that is the result of a measurement performed by the comparison sub-circuit.") (emphasis in original). But the claims already label that signal as a "comparison output signal." '479 claim 1(a) ("each of the comparison sub-circuits is adapted to produce a ***comparison output signal***"), claim 1(b) ("the ***comparison output signals*** produced by the at least two comparison sub-circuits"). Thus, to a POSA, the words of the claim confusingly identify what comes out of the comparison sub-circuit both as a "comparison output signal" and as a "measured value."

Given the well-established principle that "different claim terms are presumed to

12

have different meanings," a POSA would be confused as to whether the term "measured value input" means an input that receives the "comparison output signal" or some other, different "measured value" signal. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings.").

To make sense of the claims' use of different terms, a POSA would have attempted to interpret "measured value input" to refer to something other than simply the "comparison output signal" that comes out of the comparison sub-circuit.  Looking to the specification, a POSA would find that the specification defines a "***measurement*** window" and explains that "[t]he time of the ***measurement*** window may also be programmed."  '479 Patent at 6:55–63.  The specification explains that both the "comparison output signal" from the comparison sub-circuit and the "TW control signal" are provided as inputs to the control circuitry: e.g., "the output of comparator 209 is applied as an input" to the control circuity and "***[t]he second input . . . is a TW control signal***," which operates to "specify a sample [measurement] window." *Id.*, 10:62–11:19; *see also* Fig. 4 (illustrating distinct inputs from each comparator and a separate input from the TW control signal).



'479 Patent, Fig. 4 (annotated).  Thus, a POSA could have understood the "measured value" of "measured value input" to refer to a "TW control signal" that comprises a

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

1    *second* input into the control circuity separate and apart from the "comparison output

2    signal."  Because the claim term is subject to at least two different possible

3    interpretations by a POSA, it is indefinite.  *TVnGO*, 2020 WL 1899781, at *3; *Sensor*

4    *Elec.*, 2019 WL 4645338, at *34.

5           Nonetheless, Teradyne claims that the term needs no construction.  Teradyne Br.

6    16.  Teradyne is wrong.

7    •   Teradyne's own inventor, Mr. Gohel, confirmed that the term "measured value

8        input(s)" lacks any plain meaning as he has ***not*** used the term "measured value input"

9        in a technical context. Ex. 6 at 225:5–9.  Mr. Gohel further did not provide an actual

10       plain and ordinary meaning of the term.  *Id.*

11   •   Teradyne also cites its expert to argue that the use of the claim term "'coupled to' . . .

12       clearly conveys that the 'input' is, *e.g.*, a connection point, node, or terminal of the

13       control circuit that receives a signal [from the output of a comparison sub-circuit]."

14       Teradyne Br. 17.  But Teradyne excerpts only part of the claim language, ignoring the

15       surrounding claim language of "control circuity having two measured value inputs,"

16       which as discussed above can reasonably indicate to a POSA that measured values are

17       being input to the control circuitry.  *See supra* 11.  Teradyne also ignores the fact that

18       claims 1, 2 and 7 already use the term "connection point," which Teradyne's expert

19       admitted encompasses a connection point, node, and terminal (they are all the same).

20       Ex. 1 at 136:20–22, 132:25–133:2.  Thus, if the patent drafters meant to refer to the

21       input as such, they would have used the term "connection point."  To hold otherwise

22       would run afoul of the well-established principle that "different claim terms are

23       presumed to have different meanings." *Helmsderfer*, 527 F.3d 1382.  Finally,

24       Teradyne's argument further ignores the different uses of the term "input" in the

25       specification. *See supra* 11-12.

26   •   Teradyne next argues that the term is not indefinite because a POSA reading the

27       claims would understand that "the 'measured value input' of the control circuitry is a

28       ***measured value*** input because it receives a signal that is the result of a measurement

                                              14

performed by the comparison sub-circuit." Teradyne Br. 17. But this wrong because, as discussed above, the claims use two different terms to refer to the same thing. *See supra* 12-14. Further, the words Teradyne now uses in its brief to describe a "measured value input" ***do not appear anywhere*** in the claims or the in specification.[5] Teradyne cannot now attempt to rewrite its claims through claim construction using litigation-fueled, after-the-fact arguments to salvage the patent from poor claim drafting. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("courts may not redraft claims, whether to make them operable or sustain their validity").

- Teradyne further argues that "Claim 1 expressly discloses a [physical component] because it expressly recites the term at issue—'measured value input(s).'" Teradyne Br. 18. But this argument simply amounts to Teradyne's say-so, and nowhere in the claim does is it specified that it is a physical component.

- Finally, Teradyne argues that the specification discloses the input as a physical component by attaching an ***annotated*** version of Figure 2A. Teradyne Br. 18–19. To the contrary, Teradyne's need to add a red circle to Figure 2A highlights the very lack of disclosure of "measured value input(s)" in the '479 Patent. Teradyne also asserts without any basis that the part of the figure it now circles in red is the "measured value input." Teradyne Br. 18–19 (citing Ex. 5 at 82:5–83:6). But the arbitrarily added red circle, *id.* at 19, does not exist in the '479 Patent. Teradyne asserts that Dr. Wicker's testimony supports this new annotated figure but Dr. Wicker was not even asked about or discussing "measured value input(s)" in the quoted testimony. *See* Ex. 5 at 82:5–83:6.

Therefore, for the above reasons, "measured value input(s)" is indefinite and does not have a plain and ordinary meaning.

---

[5] Again, Teradyne's only support for this interpretation is one paragraph of its expert's declaration, which is devoid of any citation to intrinsic or extrinsic evidence. Horenstein Decl. ¶ 54.

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF                    CASE NO.: 2:20-CV-02713 GW (SHK)

### 2. If the term is not indefinite, the Court should adopt ATS's alternative construction.

The main dispute surrounding ATS's alternative construction is whether the "input" should be interpreted to be a "component" or as Teradyne asserts, a "connection point between the digital controls 201 . . . and comparator 209." Teradyne Br. 18. Teradyne's argument runs afoul of long-established precedent on claim differentiation because a "connection point" is a separate claim term in claims 1, 2, and 7, and thus it cannot be the meaning of "input." *See SA Recycling LLC v. Kramar's Iron & Metal, Inc.*, No. 12 Civ. 416, 2014 WL 12558791, at *4 (C.D. Cal. May 5, 2014) (each claim in a patent presumed to have a different scope). Indeed, Federal Circuit "precedent instructs that different claim terms are presumed to have different meanings." *Helmsderfer*, 527 F.3d at 1382; *see SIPCO, LLC v. Emerson Elec. Co.*, 794 F. App'x 946, 949 (Fed. Cir. 2019) (different words presumed to have different meanings); *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 857–58 (Fed. Cir. 2014) (same).

Although the claim term "measured value input(s)" is indefinite, if the Court finds otherwise, at best, it should be construed as "voltage data input component(s)." Wicker Decl. ¶ 81. "Voltage data" also clarifies for a POSA that the input would be receiving comprise voltage data. *Id.*

Teradyne's arguments to the contrary fail because:

- Teradyne incorrectly asserts that ATS's proposal lacks support in the intrinsic evidence. But as ATS explains, neither the specification nor the prosecution history clarifies the meaning of "measured value input(s)."

- Teradyne's argument that "component" is too narrow contradicts the testimony of its own expert, Dr. Horenstein. Dr. Horenstein agreed with ATS's construction as he admitted that a "connection point" could be a "component" and that "both nodes and terminals [are] connection points." Ex. 1 at 136:20–22, 132:25–133:2. Further, as ATS explained, the term "input" cannot simply be a "connection point" because the claims use "connection point" as a separate claim term in claims 1, 2, and 7. Thus,

16

"input" has to be something other than "connection point."  Moreover, Teradyne's construction would be a reversible error, as the specification also makes clear that the "input" and "connection point" are also two different things.  *E.g.*, '479 Patent at 12:13–18, 12:40–47; *see Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc.*, 839 F. App'x 500, 504 (Fed. Cir. 2021) ("the use of both the terms 'target' and 'produce' at different points in the specification" supports a finding that the terms have different meanings).

- Teradyne's next argument that the term should not be construed as "voltage data" is similarly illogical.  Teradyne Br. 20–21.  What else could it be if not "voltage data"? The '479 Patent is entitled "Over-Voltage Test for Automatic Test Equipment," and the purpose of the '479 Patent is to describe an ATE to "test for and respond to over-**voltage** conditions."  '479 Patent at Abstract, 1:1–3.  Voltage levels/conditions are what the '479 Patent tests, and it does so by comparing the voltage to a threshold. Thus, as Dr. Wicker explained, the "measured value" is "voltage data" that provides the result of such comparison.  Wicker Decl. ¶ 81.

Thus, ATS respectfully requests that the Court find the term "measured value input(s)" to be indefinite.  If the Court determines that the term requires a construction, ATS requests that it be construed to mean "voltage data input component(s)."

### D.    "threshold outputs"

| Claim Term | ATS's Proposed Construction | Teradyne's Proposed Construction |
|---|---|---|
| "threshold outputs" (claim 4) | Indefinite<br><br>If not indefinite: "threshold data transmission component" | Plain and ordinary meaning. |

The term "threshold output," a term that does not appear in the '479 Patent's specification, is indefinite due to similar confusion as to whether outputs as used in the patent are physical components or electrical signals.

### 1. The term "threshold outputs" is indefinite.

The term "threshold output" clearly requires explanation to a POSA as the similar term "threshold input" is explained in detail in the specification. *See* '479 Patent, 2:3–23. Yet, unlike that term, the term "threshold outputs" appears ***nowhere*** in the specification. Similarly, the prosecution history fails to offer any explanation of its meaning. This lack of explanation alone shows that the term is indefinite. *See TVnGO*, 2020 WL 1899781, at *3–4 (finding "overlay activation criterion" and "overlay activation signal" indefinite because they are not defined in the specification and are used inconsistently in the patent, and thus the patent "fail[s] to inform a POSA of the invention's scope with reasonable certainty"); *Sensor Elec.*, 2019 WL 4645338, at *34 ("[A] claim is indefinite if the specification lacks adequate guidance to give the claim term a 'reasonably clear and exclusive definition.'"); *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*, No. 18 Civ. 0555, 2019 WL 3936656, at *6–7 (D. Del. Aug. 20, 2019), *aff'd*, 966 F.3d 1374 (Fed. Cir. 2020) (finding "half-liquid" indefinite because "[t]he intrinsic and extrinsic records are, however, devoid of any indication of what defines a half-liquid").

Moreover, the '479 Patent is inconsistent as to whether the "threshold outputs" are physical components or electrical signals. Ex. 1 at 53:11–16; *see also* Wicker Decl. ¶ 106. On the one hand, the claim indicates that the outputs are "coupled to" other parts of the ATE, which Teradyne argues need to be physical. Teradyne Br. 22. On the other hand, claim 1 uses the term "output" to mean electrical signals that can be generated. *See* Wicker Decl. ¶ 106 ('479 Patent, cl. 1 ("control circuitry adapted to ***generate*** a test ***output***" where "test output" is used as an electrical signal (*e.g.*, PASS/FAIL) that can be generated by the control circuitry)). Similarly, the specification does not refer to thresholds as physical components, but rather merely data or signals. '479 Patent at Figs. 2A and 2B (no components shown for "threshold outputs"), 1:46–53. Therefore, a POSA reading the intrinsic record would not have been able to determine whether "threshold output" is used to mean a physical component or an electrical signal, thus rendering the scope of the claim unclear and the term indefinite. Wicker Decl. ¶ 106.

Teradyne's arguments that this term is not indefinite lack merit:

- Teradyne asserts that ATS "feigned confusion about whether the term 'output' is physical in nature or a signal." Teradyne Br. 22. Yet Teradyne relies *only* on Paragraph 105 of Dr. Wicker's declaration discussing the terms' physical nature, conveniently ignoring the very next paragraph, in which Dr. Wicker highlighted the confusing use of "output *both as an electrical signal* that can be generated and a physical component that can be coupled." Wicker Decl. ¶¶ 106–07. In fact, as Dr. Wicker explained, Teradyne's argument that "output" would only be physical conflicts with the actual claim language using "output" as an electrical signal, such as "control circuitry adapted to *generate* a test *output* ...and to *generate* the over-voltage *output*" in claim 1. *Id.* ¶ 106. Moreover, the patent even describes the "test output" as "a *value*" indicative of a "pass" result, further showing that "output" can be a signal. '479 Patent, 9:5–19, 11:3–5. Similarly, the "over-voltage output" is represented as a signal. *Id.*, Fig. 3.

- Teradyne also argues that ATS does not contend the closely related term "threshold input" is indefinite. Teradyne Br. 22. But as ATS explained, unlike the term "threshold output," the patent provides context for the term "threshold input." *See* '479 Patent, 2:3–23, 6:26–32, cl. 1.

- Teradyne next argues that the specification teaches that the term "threshold output" relates to "connection points to the digital controls for lines corresponding to 231, 233, 235, and 237" in Figure 2A. Teradyne Br. 23. Yet, the fact that Figure 2A shows intersecting lines does not mean that it teaches or discloses "threshold outputs," as Teradyne claims. Teradyne would have to again resort to circling artificial portions of Figure 2A as the specification clearly discloses no such physical items. Teradyne also cites portions of the specification, but the cited portions disclose how the comparator interacts with "low threshold control *input*" and "high over voltage controlled *input*." *See* '479 Patent, 6:27-41, 7:7-18. They do not shed any light on "threshold *output*."

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

### 2. If the term is not indefinite, the Court should adopt ATS's alternative construction.

In addition to the term "threshold outputs" being indefinite, at best, it should be construed to mean "threshold data transmission component." Although this term is indefinite as ATS explained, the proposed construction would clarify that the term is a physical component, '479 Patent, cl. 1; Wicker Decl. ¶ 110, a proposition with which Teradyne agrees.

Such a construction of "threshold outputs" as "threshold data transmission component" is also supported by dictionary definitions of "output." For example, the *McGraw-Hill Dictionary of Scientific & Technical Terms* includes the definition of "output" as "[t]he activity of ***transmitting*** the generated information." Ex. 8 at 1503. Similarly, *IEEE 100 The Authoritative Dictionary of IEEE Standard Terms* includes the following definitions of "output": "(A) (data transmission) Data that have been processed . . . (C) (data transmission) The device or collective set of devices used for taking data out of a device . . . (E) (data transmission) The process of ***transferring*** data from an internal storage to an external storage device." Ex. 7 at 778.

Teradyne argues that this term has a plain and ordinary meaning, and that ATS's alternative construction is not that meaning. But Teradyne is incorrect because:

- Teradyne asserts that ATS's proposed construction "does nothing to clarify the plain and ordinary meaning of the claim term." Teradyne Br. 23. But as ATS explained, this term does not have a plain and ordinary meaning in view of the claim language and the specification as the term can mean either a physical component or an electrical signal. Further, neither Teradyne nor its expert identified any such plain and ordinary meaning. In fact, the lack of plain and ordinary meaning is evident as the inventor admitted that he did not know if he had "ever used the phrase 'threshold output' in a technical context." Ex. 6 at 225:17–20. He also failed to provide any plain and ordinary meaning of "threshold outputs" in the context of claim 4 (or any other terms in claims 1–8). *Id.* at 230:9–20.

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Teradyne asserts that ATS's replacement of the term "output" with "component" is unsupported and unnecessary.  Teradyne Br. 23. It alleges that there is no intrinsic support for the word "component" yet agrees that if a construction must be given, the "output" must be physical in nature.  But as ATS explained, the basis for the alternative construction is that claim 4 requires "threshold output" to be "coupled to the threshold input."  Wicker Decl. ¶ 105.  Further, Teradyne's argument that "component" is too narrow is again contradicted by the testimony of its expert, Dr. Horenstein, who agreed that a "connection point" could be a "component" and that "both nodes and terminals [are] connection points."  Ex. 1 at 136:20–22, 132:25–133:2; *see id.* at 143:21–23.  Thus, Teradyne's expert agrees that the entire scope of Teradyne's proposal, Teradyne Br. 24 ("a connection, node, terminal, or other place by way of which voltage, current, power, or information, is provided"), is captured by ATS's alternative proposal.  Further, Teradyne's argument runs afoul of long-established case law as a "connection point" is a separate claim term in claims 1, 2, and 7, and thus it cannot be the meaning of "output."  *Helmsderfer*, 527 F.3d at 1382.

- Teradyne argues that the construction is incorrect because the word "transmission" would mean only "first generating and then sending a signal" and exclude the possibility that the signal could be initiated and controlled by other parts of the control circuitry.  *See* Teradyne Br. 24.  But that is not true.  As Dr. Wicker explained, "the output circuitry of the comparator" can be a component that "generates the threshold signal."  Ex. 5 at 133:7–10.  Thus, the alternative construction does not conflict with the transmission of the signal initiated and controlled by other parts of the control circuitry as Teradyne argued.  Teradyne Br. 24.  Moreover, Teradyne's argument also lacks merit as ATS relies further on the dictionary definition of "output," which supports that "output" is "[t]he activity of *transmitting* the generated information."

- Teradyne next asserts that the word "data" in ATS's alternative construction is unsupported and that Dr. Wicker did not explain why this word is used.  Teradyne Br. 24.  Dr. Wicker, however, explains that "in the context of the claim language and the

21

'479 Patent, the 'threshold outputs' appear to be used to ***transmit data*** regarding threshold."  Wicker Decl. ¶ 110.

Thus, the Court should find the term "threshold outputs" to be indefinite.  If the Court determines that the term requires a construction, it should be construed as "threshold data transmission component."

**E.**   **"low pass filter and/or delay element coupled between the over-voltage output and the comparison outputs of the two of the at least comparison sub-circuits"**

| Claim Term | ATS's Proposed Construction | Teradyne's Proposed Construction |
|---|---|---|
| "low pass filter and/or delay element coupled between the over-voltage output and the comparison outputs of the two of the at least two comparison sub-circuits" (claim 8) | Indefinite<br><br>If not indefinite: "low pass filter" means "a filter having a single transmission band extending from zero to a finite cutoff frequency" | Plain and ordinary meaning. |

The crux of the parties' dispute is whether this claim term has a plain and ordinary meaning, as Teradyne asserts, or is indefinite, as ATS asserts.  If the term is not indefinite, however, ATS seeks a construction of the term "low pass filter."

**1.**    **This term is indefinite.**

The term is indefinite because when "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  ***First***, the claim language uses the term "and/or" in an inconsistent and contradictory manner.  The term appears in both claim 8 and claim 9, and as Dr. Wicker explained, would have been understood by a POSA to have the same meaning in both claims.  Wicker Decl. ¶ 52.  Yet, Teradyne itself has taken contradictory positions as to its meaning in this litigation: when the parties submitted their construction of claim 9,

Teradyne asserted in the parties' Joint Claim Construction and Prehearing Statement that the term meant "and" when it was used in claim 9, but now asserts that it means "and, or, or both" when it is used in claim 8.  Dkt. 80; Teradyne Br. 25.  This requires a finding of indefiniteness because the Federal Circuit has made clear that, when a patentee takes "materially inconsistent positions" with regard to the meaning of a term, the term should be found to be indefinite.  *See Infinity Comput. Prods., Inc. v. Oki Data Ams. Inc.*, 987 F.3d 1053, 1058–59 (Fed. Cir. 2021).  Teradyne's inconsistent interpretations run afoul of the claim construction tenet that "the same terms appearing in different portions of the claims should be given the same meaning," and highlights the indefiniteness of this term. *Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) (quoting *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007)).

*Second*, adding to the confusion, although the claim suggests that both a low pass filter and a delay element might be used, the '479 Patent's specification never even suggests that both would be used, nor how or why a POSA would do so.  Instead, it discusses use of only a low pass filter *or* a delay element.  '479 Patent at 13:28–31 ("A low pass filter *or* delay element is therefore desirable in circumstances where it is desirable not to trigger an alarm output when the voltage on line 215 momentarily exceeds a set level.").  The specification also describes how the low pass filter functions *without* a delay element.  *Id.* at 13:18–20 ("Monitoring circuit 241 may contain a circuit that has *a low pass filter* characteristics and therefore *acts as a low pass filter*.").

*Third*, the fact that the specification never explains why or how *both* a low pass filter *and* a delay element would be used makes sense because, as Teradyne's own expert, admitted that a "low pass filter" is the same thing as a "delay element."  Ex. 1 at 151:23–25; *see also* Wicker Decl. ¶¶ 52–53 (similar).  As a result, a POSA reading the '479 Patent would not have understood what the claim meant when it suggested the use of both a low pass filter and delay element.  Wicker Decl. ¶ 51.

Teradyne's contention that the term has a plain and ordinary meaning in the context of the '479 Patent cannot be correct.

23

- First, Teradyne's two contrary interpretations of "and/or" demonstrate that this term does not have a plain and ordinary meaning. If it did have a plain and ordinary meaning, then Teradyne would have used that meaning consistently across the claims.

- Second, Teradyne attempts to support its argument that the term has a plain and ordinary meaning by relying on a misreading of Dr. Wicker's testimony. Teradyne Br. 26–27. Dr. Wicker explained that "it's not clear at all, and would not be clear to a person of skill why you would use both" a low pass filter and a delay element. Ex. 5 at 148:10–12; *see also* Ex. 1 at 151:23–25 (testifying the two items are the "same thing"). Further, Dr. Wicker stated that, although it would not "break the system" for a circuit to have both a low pass filter and a delay element, "it wouldn't make a lot of sense" to a POSA for a circuit to have both. Ex. 5 at 148:12–14. He also stated that "and/or" generally means "A or B or A and B." Ex. 5 at 139:11–15. Teradyne, however, takes Dr. Wicker's understanding of the phrase "and/or" outside of the context of the '479 Patent. Whether "and/or" means "A or B or A and B"— Teradyne's asserted plain and ordinary meaning—does not make sense when (1) having both "A and B" is nonsensical, as both parties' experts agreed, and (2) Teradyne itself interpreted "and/or" as "and" for claim 9. *See* Teradyne Br. 25. As Dr. Wicker explained, the term thus would not have a plain and ordinary meaning to a POSA reading the '479 Patent.

### 2. If the term is not indefinite, the Court should adopt ATS's alternative construction.

In addition to the overall term being indefinite, the term "low pass filter" should be construed to mean "a filter having a single transmission band extending from zero to a finite cutoff frequency." This construction is supported by numerous dictionaries, including the *IEEE Dictionary*, which defines "low pass filter" as "[a] filter having a single transmission band extending from zero to some cutoff frequency, not infinite." Ex. 7 at 645; *see* Ex. 11 (*The American Heritage College Dictionary*) at 820 (defines "low pass filter" as "[a] filter designed to transmit only those electromagnetic frequencies

below a certain value"); Ex. 8 at 1243 (defined as "[a] filter that transmits alternating currents below a given cutoff frequency and substantially attenuates all other currents"); Ex. 12 (*Dictionary of Computer Science Engineering & Technology* (1st ed. 2000)) at 288 (defined as "(1) filter exhibiting frequency selective characteristic that allows low-frequency components of an input signal to pass from filter input to output unattenuated; all high-frequency components are attenuated[;] (2) a filter that passes signal components whose frequencies are small and blocks (or greatly attenuates) signal components whose frequencies are large"); Ex. 4 (*Newton's Telecom Dictionary* (19th ed. 2003)) at 479 (defined as "[a] device that cuts frequencies off above a certain point and allow all other frequencies to pass"). Thus, should "low pass filter" be construed, it should mean "a filter having a single transmission band extending from zero to a finite cutoff frequency."

Teradyne argues that ATS's proposed construction "would appear" to limit the claim and exclude an embodiment based on filtering using analog signal processing techniques. Teradyne Br. 27–28. But Teradyne does not explain why understanding a "low pass filter" to have a "single transmission band" would exclude such techniques. Furthermore, Teradyne's opening brief tellingly ignores the dictionary definitions discussed above, and fails to propose its own meaning of the term.

Accordingly, in addition to finding the term "low pass filter and/or delay element coupled between the over-voltage output and the comparison outputs of the two of the at least two comparison sub-circuits" to be indefinite as a whole, ATS respectfully requests that the Court construe the term "low pass filter" to mean "a filter having a single transmission band extending from zero to a finite cutoff frequency."

## V.   CONCLUSION

For the foregoing reasons, ATS's proposals should be adopted for the five terms in dispute.

ATS'S RESPONSE TO TERADYNE'S OPENING
CLAIM CONSTRUCTION BRIEF

CASE NO.: 2:20-CV-02713 GW (SHK)

1

2    DATED:  May 27, 2021       */s/ Dale M. Cendali*

3                                  Dale M. Cendali (admitted *pro hac vice*)
dale.cendali@kirkland.com

4                                    Joshua L. Simmons (admitted *pro hac vice*)
joshua.simmons@kirkland.com

5                                    Katharine H. Cummings (admitted *pro hac vice*)
katharine.cummings@kirkland.com

6                                    KIRKLAND & ELLIS LLP
601 Lexington Avenue

7                                    New York, NY 10022
Tel. (212) 446-4800
Fax (212) 446-4900

8

9                                    Yimeng Dou (SBN 285248)
yimeng.dou@kirkland.com

10                                  N. Yvonne Stoddard (SBN 325321)
yvonne.stoddard@kirkland.com

11                                  KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700

12                                    Los Angeles, CA 90071
Tel. (213) 680-8400
Fax (213) 680-8500

13

14                                    Miranda Means (admitted *pro hac vice*)
miranda.means@kirkland.com

15                                    KIRKLAND & ELLIS LLP
200 Clarendon Street

16                                    Boston, MA 02116
Tel. (617) 385-7500
Fax (617) 385-7501

17                                    *Attorneys for Defendant/Counterclaimant*

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was filed electronically on this 27th day of May, 2021 and therefore served electronically upon counsel of record.


_/s/ Dale M. Cendali_
Dale M. Cendali